# IN THE UNITED STATES DISTRICT COURT FOR THE
# NORTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| Michael Taylor, | ) | |
| | ) | |
|     *Plaintiff*, | ) | |
| | ) | |
| v. | ) | Case No: 16 C 50313 |
| | ) | |
| Samsung Electronics America, et al., | ) | |
| | ) | |
|     *Defendants*. | ) | Judge Frederick J. Kapala |

## ORDER

Plaintiff's motion to supplement authority [101] is granted. Defendants' motion to compel arbitration [79] is granted. This case is closed.

## STATEMENT

    Plaintiff, Michael Taylor, brought suit against defendants, Samsung Electronics America, Inc. ("SEA"), and Samsung Electronics Co., Ltd. ("SEC"), alleging claims for strict products liability (Count I), negligence (Count II), and violation of the Illinois Consumer Fraud and Deceptive Business Practices Act, 810 ILCS 505/1 et seq. (Count III), all arising from injuries sustained from a Samsung Galaxy Note7 cell phone. Before the court is defendants' motion to stay and compel arbitration pursuant to the Federal Arbitration Act ("FAA"), 9 U.S.C. § 1 et seq., and plaintiff's motion to supplement authority.

## I. BACKGROUND[1]

    On August 16, 2016, plaintiff's employer, Taylorbuilt Farms, Inc., purchased a Samsung Galaxy Note7 cell phone from U.S. Cellular. On the same day, plaintiff was given the phone for his use. Plaintiff's mother, Susan Taylor, is a shareholder, director, and officer of Taylorbuilt Farms, Inc. When purchased, the phone was accompanied by a "Health & Safety and Warranty Guide" ("Guide")[2] which stated on its front page: "**Please read this manual before operating your device and keep it for future reference. This document contains important terms and conditions with respect to your device. By using this device, you accept those terms and conditions.**" Health & Safety and Warranty Guide, Introduction. The following page stated,

    **READ THIS INFORMATION BEFORE USING YOUR MOBILE DEVICE.**

---

[1]The facts pertinent to the court's analysis are taken from the complaint, defendants' exhibits in support of its motion to stay and compel arbitration, and plaintiff's exhibits in support of its response thereto.

[2]All quotations from the Guide reflect original bolded, capitalized, and underlined text.

> **Samsung Limited Warranty** - This product is covered under the applicable Samsung Limited Warranty **INCLUDING ITS DISPUTE RESOLUTION PROCEDURE and your right to opt out of arbitration within 30 calendar days of the first consumer purchase.** . . . For more detailed procedures, please refer to the "Dispute Resolution Procedures and Arbitration and Opt-Out" section of the Limited Warranty.

Id. The "Dispute Resolution Procedures and Arbitration and Opt-Out" section, which began on page 21 of the Guide as indicated by page 1 of the index, read as follows:

> ALL DISPUTES WITH SAMSUNG ARISING IN ANY WAY FROM THIS LIMITED WARRANTY OR THE SALE CONDITION OR PERFORMANCE OF THE PRODUCTS SHALL BE RESOLVED EXCLUSIVELY THROUGH FINAL AND BINDING ARBITRATION, AND NOT BY A COURT OR JURY. . . . The arbitration shall be conducted according to the American Arbitration Association (AAA) Commercial Arbitration Rules applicable to consumer disputes. . . . This arbitration provision is entered pursuant to the Federal Arbitration Act. The laws of the State of Texas, without reference to its choice of law principles, shall govern the interpretation of the Limited Warranty and all disputes that are subject to this arbitration provision. The arbitrator shall decide all issues of interpretation and application of this arbitration provision and the Limited Warranty.
>
> . . . .
>
> This arbitration provision also applies to claims against SAMSUNG's employees, representatives and affiliates if any such claim arises from the Product's sale, condition or performance.
>
> **You may opt out of this dispute resolution procedure by providing notice to SAMSUNG <u>no later than 30 calendar days from the date of the first consumer purchaser's purchase of the Product</u>.** . . . **Opting out of this dispute resolution procedure will not affect the coverage of the Limited Warranty in any way, and you will continue to enjoy the benefits of the Limited Warranty.**

Id. at 21-23. The Guide was also made available online and accessible on the phone itself under "Legal Information" within the "Settings" > "About Device" menu. It is undisputed that plaintiff was the primary and intended user of the phone and there is evidence that within one month of plaintiff's receipt of the phone it was used for over two hundred phone calls and over nine hundred text messages. The record does not reflect what other activities the phone was used for during the same time period, but it had the same features and capabilities as most mainstream smart phones.

Plaintiff alleges that he suffered injuries during the night spanning September 12 to 13, 2016

2

when the phone, lying near him, malfunctioned while charging. On September 13, 2016, Mark Taylor, shareholder, director, and officer of Taylorbuilt Farms, Inc., contacted U.S. Cellular to report the incident. Plaintiff brought the instant suit and defendants moved to compel arbitration pursuant to the above arbitration clause.

## II. ANALYSIS

"Generally, federal policy favors arbitration, and once an enforceable arbitration contract is shown to exist, questions as to the scope of arbitrable issues should be resolved in favor of arbitration." Scheurer v. Fromm Family Foods LLC, 863 F.3d 748, 752 (7th Cir. 2017). Section 2 of the FAA provides that

> [a] written provision in . . . a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction, or the refusal to perform the whole or any part thereof, or an agreement in writing to submit to arbitration an existing controversy arising out of such a contract, transaction, or refusal, shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.

9 U.S.C. § 2. The Seventh Circuit has recently noted that this law

> reflects both a liberal federal policy favoring arbitration and the fundamental principle that arbitration is a matter of contract. It requires federal courts to place arbitration agreements on an equal footing with other contracts and enforce them according to their terms. We will compel arbitration under the Federal Arbitration Act if three elements are present: (1) an enforceable written agreement to arbitrate, (2) a dispute within the scope of the arbitration agreement, and (3) a refusal to arbitrate.

A.D. v. Credit One Bank, N.A., 885 F.3d 1054, 1060 (7th Cir. 2018) (citations omitted).[3] It is undisputed that plaintiff refuses to arbitrate, so the third element is satisfied.

### A. Enforceable Agreement to Arbitrate

A court must first determine whether there was an enforceable agreement to arbitrate. "A vendor, as master of the offer, may invite acceptance by conduct, and may propose limitations on the kind of conduct that constitutes acceptance. A buyer may accept by performing the acts the vendor proposes to treat as acceptance." ProCD, Inc. v. Zeidenberg, 86 F.3d 1447, 1452 (7th Cir. 1996); see also NECA-IBEW Rockford Local Union 364 Health & Welfare Fund v. A & A Drug Co., 736 F.3d 1054, 1058 (7th Cir. 2013) ("As a general matter, a party may become bound to an

---

0. The first two elements are also required under Texas law. See Jody James Farms, JV v. Altman Grp., Inc., 547 S.W.3d 624, 633 (Tex. 2018) ("When relying on a contract to compel arbitration, the moving party must first establish the existence of a valid and enforceable arbitration agreement. Second, the claims at issue must fall within the arbitration agreement's scope." (footnote omitted)).

3

unsigned contract, including one that contains an arbitration clause, by its or its agent's conduct."). The Seventh Circuit recognized this principle in Hill v. Gateway 2000, Inc., explaining that "terms inside a box of software bind consumers who use the software after an opportunity to read the terms and to reject them by returning the product." 105 F.3d 1147, 1148 (7th Cir. 1997).

Plaintiff asserts that he never saw the Guide contained within the box in which his cell phone was sold because his employer purchased it, removed the phone from the box, and gave it to plaintiff. From this plaintiff concludes that he is not bound to the arbitration agreement contained within the Guide.

Whether plaintiff took advantage of the opportunity to read the terms and conditions does not affect the contract's enforceability; as long as there was a reasonable opportunity for plaintiff to read the terms and reject them, he is bound by them. See Boomer v. AT & T Corp., 309 F.3d 404, 415 (7th Cir. 2002). In Boomer, the Court addressed a contract which stated that "the consumer was 'accepting the terms of the Agreement simply by continuing to use or pay for any AT & T state-to-state or international consumer calling service.'" Id. at 414. Though Boomer argued that his continued use of the long-distance service did not constitute his assent to the contract, the Court concluded that "Boomer had a reasonable opportunity to reject AT & T's offer, but nonetheless continued to use his AT & T services . . . . Under these circumstances, Boomer's silence constituted an acceptance." Id. at 415 (citing Hill, 105 F.3d at 1148-49); see also Kaufman v. Am. Exp. Travel Related Servs. Co., No. 07 C 1707, 2008 WL 687224, at *6 (N.D. Ill. Mar. 7, 2008) ("Courts have held that a consumer accepts terms, read or not, upon using a product, but only where an opportunity to avoid the undesirable terms exists." (citing Carnival Cruise Lines, Inc. v. Shute, 499 U.S. 585, 594 (1991))); Chandler v. AT & T Wireless Servs., Inc., 358 F. Supp. 2d 701, 704 (S.D. Ill. 2005) ("By using her phone rather than canceling immediately, or no later than thirty days after her activation date, Chandler accepted the offered services and the terms and conditions under which they were offered. She had a clear mechanism and reasonable opportunity to reject them."). Under Hill and Boomer, plaintiff's conduct, using the phone and not taking advantage of the 30-day opt-out provision, manifested his assent to the terms contained within the Guide, which he had the opportunity to read either online or on the phone itself. See Falbe v. Dell Inc., No. 04-C-1425, 2004 WL 1588243, at *4 (N.D. Ill. July 14, 2004) ("Under Hill, it is plain that Falbe's conduct, i.e., keeping the computer beyond 30 days, manifested his assent to the Terms and Conditions, and created a valid and enforceable agreement to arbitrate."); see also Schnabel v. Trilegiant Corp., 697 F.3d 110, 120 (2d Cir. 2012) ("[W]here there is no actual notice of the term, an offeree is still bound by the provision if he or she is on inquiry notice of the term and assents to it through the conduct that a reasonable person would understand to constitute assent."); McNamara v. Samsung Telecomms. Am., LLC, Case No. 14 C 1676, 2014 WL 5543955, at *2 (N.D. Ill. Nov. 3, 2014) ("Moreover, the location of the arbitration provision in a large document is reasonable. We are dealing with so-called 'smart phones' which by their nature are extremely complicated and provide for a multitude of activities. Because of these qualities, a purchaser would be expected to review the product user guide in order to get as much out of the product as he can. The Court therefore finds that the contract between Plaintiffs and Samsung provided reasonable notice of the arbitration clause.").

Plaintiff received the phone on August 16, 2016, which was also the date of its purchase. The language of the Guide, available on that day in hard copy accompanying the phone, and

4

continually available on the phone itself and on Samsung's website, stated that "**[y]ou may opt out of this dispute resolution procedure by providing notice to SAMSUNG no later than 30 calendar days from the date of the first consumer purchaser's purchase of the Product.**" This means that the opt-out provision did not expire until September 16, 2016. Plaintiff was injured on either September 12 or September 13, 2016, meaning he used and had possession of the phone for about a month without asking his employer to provide him with any form of user instructions or paperwork that accompanied the phone, such as the Guide[4] that came with the phone and is accessible directly on the phone. Even when the cell phone injured plaintiff, and with three or four days remaining before the opt-out provision had expired, plaintiff still did not take any of these steps to learn about the terms or conditions connected to the purchase of the phone, why his phone had malfunctioned, or what his legal rights were in the aftermath of his injury.

Furthermore, the Guide was also available online, where plaintiff could have read about the opt-out provision in full force. A cell phone company's posting of its terms and conditions on its website provides users of its products a reasonable opportunity to read them. See, e.g., Schwartz v. Comcast Corp., 256 Fed. App'x 515, 520 (3d Cir. 2007) ("The terms of the Subscriber Agreement were available to Schwartz at all times because the Agreement was posted on Comcast's web site. Schwartz argues that the contract was too difficult to find, but the record demonstrates that the Agreement is available to all of Comcast's subscribers via its website. It is true that in some cases, a party is excused from the terms of a contract where he never had access to the contract and thus could not make himself aware of its terms. However, in this case, the terms of the contract were available to Schwartz via the web site, and thus they are binding, despite the fact that he was unaware of them." (citation omitted)); Arellano v. T-Mobile USA, Inc., No. C 10–05663 WHA, 2011 WL 1362165, at *3 (N.D. Cal. Apr. 22, 2011) ("T-Mobile's placement of the arbitration agreement in the Terms & Conditions . . . does not make their presentation unclear. The Terms & Conditions were readily available. They were included in the box with the telephones sold by T-Mobile, and they also were available online at www.T-Mobile.com or by calling T-Mobile's toll-free Customer Care number."). Under these circumstances, plaintiff had reason, and reasonable opportunity, to inquire about any possible terms and conditions that may have accompanied the phone in the three or four days immediately following his injury by (1) consulting the Guide, (2)

---

0. The court notes that (1) plaintiff's employer is called Taylorbuilt Farms, Inc., (2) plaintiff's last name is Taylor, (3) plaintiff's mother's last name is Taylor, (3) plaintiff's mother was a shareholder, director, and officer of Taylorbuilt Farms, Inc., (4) Mark Taylor, another shareholder, director, and officer of Taylorbuilt Farms, Inc., was the one who contacted U.S. Cellular when plaintiff was injured to report the incident, and (5) though not operative here, plaintiff's initial complaint alleged that "the Taylor family purchased a Samsung Galaxy Note 7 cellular phone for use by Michael Taylor." From this, it is reasonable to infer that plaintiff had an opportunity to be in communication with his employer regarding the phone and, if so desired, any other items or papers that accompanied the phone at the time of its purchase.

accessing the Guide directly on the phone, or (3) reading the Guide on Samsung's website.[5]

Plaintiff argues additionally that only the purchaser or original owner of a product can be bound to terms and conditions that are triggered by the use of the product when a hard copy of those terms and conditions accompanies the sale of the product but is discarded at the time of purchase. However, the Guide does not state that its terms apply only to defendants and the initial purchaser. On its title page in bold typeface the Guide states that "[t]**his document contains important terms and conditions with respect to your device. By using this device, you accept those terms and conditions.**" The following page states that the phone is covered under the Samsung Limited Warranty, "**INCLUDING ITS DISPUTE RESOLUTION PROCEDURE and your right to opt out of arbitration within 30 calendar days of the first consumer purchase.**" The arbitration provision itself states that "[y]ou may opt out of this dispute resolution procedure by providing notice to SAMSUNG no later than 30 days from the date of the first consumer purchaser's purchase of the Product." If the court were to accept plaintiff's position, it would mean that any unwanted terms in a contract could be avoided by having some party, such as an employer, purchase a product, discard all hard copies of agreements that accompanied the product at the time of its purchase, and then deliver the product to the intended end user. See, e.g., Hoekman v. Tamko Bldg.Prods, Inc., No. 2:14-cv-01581-TLN-KJN, 2015 WL 9591471, at *7 (E.D. Cal. Aug. 26, 2015) ("Holding for the Plaintiffs would mean that purchasers can deny unwanted terms, as long as they avoid reading them prior to purchase and then have the product delivered to someone else. With good reason, prior courts have rejected this outcome. Similarly, this Court finds that Plaintiffs' alleged lack of actual notice is not enough to overturn the valid arbitration agreement.").

This argument also fails when applying traditional principles of agency law. An employee is an agent of his employer when acting within the scope of his employment, and, under "traditional agency theory," courts in the Seventh Circuit have held that, "[b]ecause a principal is bound under the terms of a valid arbitration clause, its agents, employees, and representatives are also covered under the terms of such agreements." Denari v. Rist, No. 10–cv–2704, 2011 WL 332543, *9-10 (N.D. Ill. Jan 31, 2011) (Dow, J.) (quoting Pritzker v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 7 F.3d 1110, 1121 (3d Cir. 1993)) (finding that arbitration agreement of employer bound employee even though employee did not sign agreement); see also Belom v. Nat'l Futures Ass'n, 284 F.3d 795, 799 (7th Cir. 2002) ("This rule is an outgrowth of the strong federal policy favoring arbitration.").

Here, plaintiff submitted the affidavit of his mother, Susan Taylor, which stated that the phone was "a tool, similar to other company tools, our employees use to perform their jobs." Susan

---

[5] Plaintiff argues that defendant SEC was not explicitly named in the Guide, so cannot invoke the arbitration agreement. The Guide states that "[t]his arbitration provision also applies to claims against SAMSUNG's employees, representatives and affiliates if any such claim arises from the Product's sale, condition or performance." SEC is a parent company of SEA, so is included in the language of the contract as an affiliate and can enforce the arbitration agreement. See Gammon v. GC Servs. Ltd. P'ship, 27 F.3d 1254, 1257-58 (7th Cir. 1994) (adopting the Black's Law Dictionary definition of "affiliate"); Black's Law Dictionary (10th ed. 2014) (defining "affiliate" as "[a] corporation that is related to another corporation by shareholdings or other means of control; a subsidiary, parent, or sibling corporation."); see also Schmidt v. Samsung Elecs. Am., Inc., CASE NO. C16-1725-JCC, 2017 WL 2289035, at *7 (W.D. Wash. May 25, 2017) (analyzing the same contract language, and holding that "[t]he agreement applies to SEA's 'affiliates.' SEA's parent companies plainly fall within the realm of SEA's 'affiliates.' Thus, SEC . . . can enforce SEA's arbitration agreement").

Taylor Aff. ¶ 5. Plaintiff's use of the phone fits squarely within the scope of his employment. Therefore, both the introduction to the Guide and the arbitration procedure itself indicate that the contemplated party who may take advantage of the opt-out provision may be some user other than the "first consumer purchaser."

Plaintiff also argues that the arbitration agreement was unconscionable because it was inconspicuously embedded in the Guide. While contracts can be either procedurally or substantively unconscionable, see Hanover Ins. Co. v. N. Bldg. Co., 751 F.3d 788, 794 (7th Cir. 2014); LDF Constr., Inc. v. Texas Friends of Chabad Lubavitch, Inc., 459 S.W.3d 720, 731 (Tex. App. 2015), plaintiff has argued only for procedural unconscionability, which exists if "an impropriety in the process of forming the contract deprived a party of a meaningful choice," Hanover, 751 F.3d at 794. "Procedural unconscionability refers to a situation where a term is so difficult to find, read, or understand that the plaintiff cannot fairly be said to have been aware he was agreeing to it." Jackson v. Payday Fin., LLC, 764 F.3d 765, 777 (7th Cir. 2014) (quoting Razor v. Hyundai Motor Am., 222 Ill.2d 75, 100 (2006)); see also AutoNation USA Corp. v. Leroy, 105 S.W.3d 190, 198-99 (Tex. App. 2003) (stating that "procedural unconscionability . . . refers to the circumstances surrounding the adoption of the arbitration provision," and finding the arbitration agreement sufficiently conspicuous to overcome a procedural unconscionability argument).

The core of plaintiff's argument is that "the arbitration provision is procedurally unconscionable because it was buried on the 21st page of the owner's Health and Safety Warranty guide," and that "not until the 23rd page does the opt-out provision show up." Plaintiff states that if the opt-out provision "were so important to Samsung, they would have put it in the first few pages of the Health and Safety Warranty guide." Plaintiff's argument fails for multiple reasons. First, he misstates the conspicuousness of the arbitration clause. As previously explained, the opt-out procedure is explicitly mentioned, in bold capital letters, on the second page of the introduction to the Guide and page 1 of the Guide contains an index that indicates that the "Procedures for Dispute Resolution/30-day Arbitration and Opt-Out Policy" begin on page 21. Thus, the arbitration clause and opt-out procedure are explicitly referenced "in the first few pages of the" Guide, just as plaintiff suggests they should have been. Then, on the top of page 21, under the bolded title which again references the 30-day opt-out policy, the Guide states, in all capital letters, that "ALL DISPUTES WITH SAMSUNG ARISING IN ANY WAY FROM THIS LIMITED WARRANTY OR THE SALE CONDITION OR PERFORMANCE OF THE PRODUCTS SHALL BE RESOLVED EXCLUSIVELY THROUGH FINAL AND BINDING ARBITRATION, AND NOT BY A COURT OR JURY." Contrary to plaintiff's description, the Guide did not conceal the arbitration provision; it is immediately apparent upon a mere glance through the Guide.

Second, even if plaintiff had accurately characterized the Guide, its arbitration provision is not procedurally unconscionable. As indicated by the court's review of its conspicuousness, the provision was not "so difficult to find, read, or understand that the plaintiff cannot fairly be said to have been aware he was agreeing to it." Jackson, 764 F.3d at 778 (quoting Razor, 222 Ill. 2d at 100); see also AutoNation, 105 S.W.3d at 199 (finding that (1) even if Texas law imposed a specific conspicuousness requirement for arbitration provisions, it would be preempted by the FAA, and (2) a contract with form language encouraging the reader to review the agreement, including arbitration terms, was not procedurally unconscionable); Fleetwood Enters. v. Gaskamp, 280 F.3d 1069, 1077 (5th Cir. 2002) ("The only cases under Texas law in which an agreement was found

7

procedurally unconscionable involve situations in which one of the parties appears to have been incapable of understanding the agreement."); Webb v. Investacorp, Inc., 89 F.3d 252, 259 (5th Cir. 1996) (noting arbitration provision was not procedurally unconscionable even though size of print was uniform throughout contract). Plaintiff, citing Davis v. Fenton, 26 F. Supp. 3d 727, 737-38 (N.D. Ill. 2014) (Castillo, J.), argues that the arbitration agreement was "hidden in a maze of fine print," making it procedurally unconscionable. Aside from the fact that the provision was not as hidden as plaintiff suggests, the Court in Davis was faced with a less conspicuous arbitration provision than the one in the Guide and still found it not procedurally unconscionable. The Court explained,

> [a]n arbitration clause does not need to be emphasized with any special font or typeface to prevent it from being procedurally unconscionable; it just needs to be conspicuous. . . . The text of the arbitration clause is in the same font and size as the rest of the retainer agreement. And although the arbitration clause starts at the bottom of the fifth page and continues on to the top of the sixth page, the section is set off by a blank line above and below it, clearly separating section 17 from sections 16 and 18, and making it easy to read. The arbitration clause is thus not hidden in a maze of fine print. The Court therefore cannot conclude that the placement of the arbitration clause and its font size and typeface make it procedurally unconscionable.

Id. at 738. The arbitration provision here was easier to find and read than the arbitration provision in Davis; it was explicitly referenced in the Guide's introduction, clearly indicated in the index on page 1 of the Guide, and appeared in all capital letters on the indicated page. Finally, the opt-out provision made clear the simple steps (via email or phone call) plaintiff could have taken if he wished to avoid the provision.

The theme of plaintiff's argument can be summarized in his own words: "According to the Samsung defendants, any remote user of its exploding phone is barred from the Courthouse based upon the sole fact that when the purchaser of the phone took possession of the phone, there was buried in the owner's documents an arbitration clause." However, contracts like the one contained in the Guide, which was available to the user of the phone, "reduce transactions costs and benefit consumers because, in competition, reductions in the cost of doing business show up as lower prices." Carbajal v. H & R Block Tax Servs., Inc., 372 F.3d 903, 906 (7th Cir. 2004). Despite plaintiff's antagonism towards arbitration, his qualms with the provision are not grounds for unconscionability; "[t]he cry of 'unconscionable!' just repackages the tired assertion that arbitration should be disparaged as second-class adjudication. It is precisely to still such cries that the Federal Arbitration Act equates arbitration with other contractual terms." Id.[6]

---

[6]Because the court has determined there is an enforceable agreement to arbitrate between plaintiff and defendants, it need not rule upon defendants' alternative arguments that even if plaintiff is not a party to the contract, he is still bound to arbitration as a third-party beneficiary or through theories of agency or estoppel.

## B. Dispute Within the Scope of the Arbitration Agreement

If a court determines there was an enforceable agreement to arbitrate, it must then decide whether the dispute is within the scope of the arbitration agreement. The Guide's arbitration agreement includes within its scope "ALL DISPUTES WITH SAMSUNG ARISING IN ANY WAY FROM THIS LIMITED WARRANTY OR THE SALE CONDITION OR PERFORMANCE OF THE PRODUCTS." The operative words in the preceding scope of the arbitration agreement, "arising in any way from," are words that courts have read broadly. See Gore v. Alltel Commc'ns, LLC, 666 F.3d 1027, 1036 (7th Cir. 2012) ("Given our broad reading of 'arising out of and relating to,' we are confident that these claims also fall within the scope of the arbitration clause."); Bass v. SMG, Inc., 328 Ill. App. 3d 492, 498 (2002) ("Courts have generally construed 'generic' arbitration clauses broadly, concluding that the parties are obligated to arbitrate any dispute that arguably arises under an agreement containing a 'generic' provision. The particular language which courts have in the past labeled 'generic' demands arbitration of either 'disputes arising out of' or 'disputes arising out of or related to' the agreement at issue." (citation omitted)); see also In re NEXT Fin. Grp., Inc., 271 S.W.3d 263, 268 (Tex. 2008) ("[I]n construing contracts generally, this Court has stated that 'arising out of' are words of broad significance."); In re Merrill Lynch Trust Co. FSB, 235 S.W.3d 185, 202 (Tex. 2007) ("The scope of the arbitration provision the Alanizes signed when they first began dealing with Medina is broad. It encompasses 'all controversies which may arise between us.'"); In re D. Wilson Constr. Co., 196 S.W.3d 774, 777 (Tex. 2006) ("Paragraph 4.5 of A201 is titled 'Arbitration,' and subparagraph 4.5.1, titled 'Controversies and Claims Subject to Arbitration,' sets forth the broad, catch-all scope of the arbitration agreement: 'Any controversy or Claim arising out of or related to the Contract, or the breach thereof, shall be settled by arbitration.'"). Finally "[t]he Arbitration Act establishes that, as a matter of federal law, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 24-25 (1983); see also Scheurer, 863 F.3d at 752. ("Generally, federal policy favors arbitration, and once an enforceable arbitration contract is shown to exist, questions as to the scope of arbitrable issues should be resolved in favor of arbitration."); Denari, 2011 WL 332543, at *11 ("In determining whether a particular dispute falls within the scope of an arbitration clause, a presumption of arbitrability exists such that arbitration should be compelled unless it can be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute.") (quoting AT&T Tech., Inc. v. Commc'ns Workers of Am., 475 U.S. 643, 650 (1986) (internal citations omitted)). All of the disputes here, centered around plaintiff's injuries caused by his phone and presented by plaintiff as claims for strict products liability, negligence, and violations of the Illinois Consumer Fraud and Deceptive Business Practices Act, arise from "the sale, condition, or performance" of the phone. Therefore, they fall within the arbitration agreement's scope.

## III. CONCLUSION

Because there is "(1) an enforceable written agreement to arbitrate, (2) a dispute within the scope of the arbitration agreement, and (3) a refusal to arbitrate," A.D., 885 F.3d at 1060, the court grants defendants' motion to compel arbitration. Though there is some disagreement in this district over the question of whether courts should stay or dismiss after granting a motion to compel arbitration, compare Imperial Crane Sales, Inc. v. Sany Am., Inc., No. 15 C 859, 2015 WL 4325483, at *5 (N.D. Ill. July 15, 2015), with HTG Capital Partners, LLC v. Doe, No. 15 C 02129, 2016 WL

612861, at **7-8 (N.D. Ill. Feb. 16, 2016), the court concludes that, under the circumstances of this case, "dismissing rather than staying is sensible because there is nothing for the court to decide" since all of plaintiff's claims are subject to arbitration. HTG, 2016 WL 612861, at *8. Indeed, the Seventh Circuit has regularly affirmed district courts' decisions to dismiss suits where all the claims are arbitrable. See, e.g., Johnson v. Orkin, LLC, 556 F. App'x 543, 544 (7th Cir. 2014); Baumann v. Finish Line, Inc., 421 F. App'x 632, 636 (7th Cir. 2011). For these reasons, the court joins the "growing trend favoring dismissal of a case when all the claims are subject to arbitration," HTG, 2016 WL 612861, at *8, and dismisses the case without prejudice.

Date: 8/16/2018                                    ENTER:

                                                                                    FREDERICK J. KAPALA

                                                                                    District Judge